**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| VALENTINA MAKER : | |
| : | |
| v.  : | CIVIL ACTION NO. 21-4120 |
| : | |
| TEMPLE UNIVERSITY : | |

**MEMORANDUM**

**McHugh, J.**                                                                                           **June 26, 2023**

### I.    Findings of Fact

This is an action against Temple University[1] brought by Valentina Maker, a former student, following her dismissal from Temple's graduate program in the Department of Physical Therapy ("DPT"). She alleges a violation of procedural due process and asserts a claim based upon promissory estoppel.[2] Following a non-jury trial, I make the following findings of fact.

### a.   Findings pertinent to Plaintiff's performance as a student

Plaintiff participated in the DPT program for approximately two years, from June 2018 until July 2020, when she failed her Clinical Experience I internship at Temple University Hospital ("TUH") and was dismissed. Her dismissal was based upon the Temple DPT Student Handbook, which provided that:

> A student who receives more than two grades below B- or one grade of F will be dismissed from the program for substandard academic performance. . . . Receipt of any grades below a B is an indication that the student is performing at a substandard academic level. . . . A student with one grade below B- will be informed in writing by the Dean of the Graduate School that he/she is in academic jeopardy. The students must attain a passing grade (P) on all clinical education courses. **If the student fails a clinical education course they will be dismissed from the program**.

---

[1] The proper name for Defendant is Temple University of the Commonwealth System of Higher Education.

[2] During argument at trial of this action, counsel withdrew a claim for violation of substantive due process.

Exhibit 12, p, 10 (emphasis added).[3]

Even before her failure in the clinical placement, Plaintiff struggled in the program. During her first two years, Plaintiff received a grade of B- in five classes and a C+ in one class. Exhibit 16. I accept the testimony of Temple witnesses that, in a graduate program, a grade of B- is considered substandard, and as specified in the handbook Plaintiff was on the brink of dismissal even before the clinical failure by virtue of her grade of C+. As one illustration, Plaintiff's performance in her Clinical Examination & Intervention Skills I and II Labs earned an overall exam grade of 76% and an overall quiz grade of 78.57%. Exhibit 17. Her professor, Rebecca Vernon Operacz, even offered Plaintiff the opportunity to retake the final exam, on which she scored a 72%, to give Plaintiff the chance to raise her overall grade to a B-. Plaintiff declined that offer, however, because a group project grade had boosted her overall final grade for that class.

Plaintiff's performance in both academic and clinical settings concerned Professor Operacz, a concern that included patient safety. On September 23, 2019, Professor Operacz placed Plaintiff on a Learning Contract because she "displayed a need for remediation prior to the first clinical experience within the following domains: safety, accountability, communication, clinical reasoning." Exhibit 21, p. 1. The Learning Contract required Plaintiff to attend extra sessions with Professors Operacz and Thompson and to submit written reflections on her skill development. The record reflects that Plaintiff's teachers did in fact invest time in meeting with her to improve her skill set. Exhibit 18.

---

[3] There were two editions of the Handbook during Plaintiff's enrollment. In all material respects they are identical.

Later that same semester, more than two months into her Learning Contract, Plaintiff dropped a standardized patient[4] during one of her practical exams and failed the exam. Exhibit 22, Bates 217. Professor Operacz permitted Plaintiff to retake the exam approximately one week later, and she earned the same failing score: 58 out of 100. The incorrect answers suggested a failure to grasp fundamental concepts, such as specifying better ambulation for a patient limited to a power wheelchair. Exhibit 22, Bates 00221-24.

Before students' first full clinical placements, they take Integrated Clinical Experience ("ICE") courses meant to expose them to the scenarios they will encounter as practicing physical therapists. Plaintiff had completed five ICE rotations before she began her first formal clinical placement.

Temple University, in cooperation with TUH, assigned Plaintiff to work with Patricia Garcia, a full-time physical therapist, as her clinical instructor for her first full Clinical. Dr. Andrea Blau was the Site Coordinator for Temple at TUH and supervised the clinical instructors and their interns. Around the third week, Ms. Garcia called Professor Operacz to discuss her concerns regarding Plaintiff's performance, and then documented some of those concerns in an email:

> 1.   Communication - Valentina has had difficulty obtaining pertinent information when interviewing patients at the initial evaluation. For example, Valentina has neglected to ask questions regarding baseline level of functional mobility or baseline DME needs.
>
> 2.   Cultural Competence - Valentina has had some difficulty showing empathy, sensitivity, and respect towards patients, particularly the bariatric population. This was directly discussed at the end of week three and the expectation is that Valentina will acknowledge any bias towards a given patient population and grow in this area.
>
> 3.   Examination/Evaluation - Valentina has struggled with basic MMT, ROM, and transfers assessments, at times failing to correlate important information and draw conclusions from test values and observations. Valentina has also had difficulty extracting and analyzing information from the medical record failing to

---

[4] Temple employs actors to present as real patients for certain skill-related quizzes and tests.

3

> anticipate how certain co-morbidities, congenital diseases/disorders, abnormal lab value/vitals might have an impact on present mobility.
>
> 4.      Professional Development - It is most concerning to me that Valentina has not shown she is a proactive learner and many times requires repetitive cues, guidance, and encouragement to seek further leaning or reviewing of course lectures.  I have given Valentina a lot of direct feedback regarding being a proactive learner and at the end of last week encouraged her to reflect on her performance, identify what requires continued growth, and determine how she could better provide me feedback in order to make sure she is learning in a productive and effective environment that best suits her learning preference/needs.
>
> 5.      Documentation - Valentina oftentimes omits or incorrectly documents objective measures gathered from an evaluation or progress notes.  I have stressed the importance of the medical record being a legal document that requires concise, complete, and accurate information.
>
> We have been working hard together to address the concerns highlighted above.  I still find myself being very repetitive with my feedback.  We continue to work on goal setting every week and do our best to discuss every patient in a timely manner.  I have encouraged Valentina to self-reflect and also provide me with feedback.  Hoping week four starts well.  My last area of concern is regarding the CPI.  This week we are scheduled to complete the CPI and she has expressed a number of times that she is unsure of how to fill it out.  I encouraged her to start it early.  Will keep you posted.

Exhibit 56.

"CPI" stands for Clinical Performance Instrument and is a tool for a student and instructor to address critical issues on parallel tracks and then compare their respective assessments.  Exhibit 30.  A comparison of Plaintiff's self-evaluation with Ms. Garcia's assessment shows a stark contrast between Plaintiff's view of her own performance and her actual performance.  *See* Exhibit 30.  Following the CPI process, Professor Operacz placed Plaintiff on a second Learning Plan:

> In light of the concerns regarding your clinical performance so far, I am instituting a learning plan to push you to recognize the areas where you are in need of significant improvement.  I am including Pati on this email so that you can both discuss and review this learning plan . . . I want to stress the importance of your responsibility for your learning and growth as a clinician.  Pati is your mentor in this experience, but she should not have to repeatedly guide you through each step of patient care.

Exhibit 31.

During the fourth week of the Clinical, Ms. Garcia documented more problematic patient interactions. Exhibit 33. On July 16, 2020, Professor Operacz completed a Clinical Experience I Check-In Form. On this form, she noted that Ms. Garcia had not given Plaintiff a satisfactory written evaluation at the mid-point of her First Clinical. Exhibit 58. In her courtroom testimony, Ms. Garcia gave specific examples of patient safety issues, including Plaintiff's inability to cope with overweight patients, and the records introduced into evidence by Temple contain many contemporaneous notes documenting issues with Plaintiff's performance.

Plaintiff spent the morning of June 17, 2020 with Andrea Blau, the Clinical Site Supervisor. Ms. Blau had previously worked with Plaintiff, and the assignment that morning was specifically for the purpose of having another professional observe and evaluate Plaintiff. Ms. Blau determined Plaintiff was struggling with basic concepts and posed a safety risk to the TUH patients, and sent her home by noon. She then informed Professor Operacz. Ms. Blau's observations and concerns are set forth in the Critical Incident Report dated July 21, 2020. Exhibit 35. This resulted in Plaintiff's dismissal from the program. The DPT Student Handbook provides:

> **The students must attain a passing grade (P) on all clinical education courses. If the student fails a clinical education course they will be dismissed from the program**.

Exhibit 12, p. 10. Separately, Temple's DPT Clinical Education Handbook provides:

> If a student is removed from the clinical environment due to safety or any other events or behavior deemed to be of significant concern by the clinical site or DCE, this constitutes failure of the clinical education experience. If a student fails a clinical education experience, they will be notified in writing or verbally by the Director of Clinical Education or Chair of the Academic Status Committee and will be dismissed from the DPT program per program policy.

Exhibit 13, p. 20.

I found the testimony of Dr. Vernon-Operacz, Dr. Patricia Garcia, and Dr. Andrea Blau to

5

be credible in all respects. They presented as competent and caring health care providers dedicated to their profession and to educating future generations of physical therapists. I found no evidence of unfair animus directed toward Plaintiff and conclude that her dismissal was based on valid academic grounds and legitimate concerns for patient safety.

      **b. Findings pertinent to due process**

The DPT Handbook explains the process students must follow to petition for reinstatement. Exhibit 12. It is apparent that Plaintiff understood the process because she pursued each of the five levels of review.

Plaintiff had a hearing before the Academic Status Committee ("ASC") on August 3, 2020. Exhibit 37. That Committee voted to recommend to reinstate Plaintiff in the DPT program if "she underwent remediation consisting of retaking DPT courses and receiving additional remedial training in areas where she struggled." Exhibit 60, August 19, 2020 Letter. This remediation would have required Plaintiff to retake any courses in the DPT with a B- or below and to repeat the clinical placement. See Exhibit 12, Handbook.

Pursuant to the appeals process, on August 19, 2020, the DPT faculty then met to consider Plaintiff's Petition for Reinstatement and the ASC's recommendation. Exhibit 60. The DPT faculty voted against reinstatement. Several faculty members raised concerns about re-admitting Plaintiff given that she had already been given numerous remediation opportunities during her time in the DPT program leading up to Clinical Experience I. Several of the DPT program faculty expressed their view that she could not be successful even with further remediation.

The official vote count was one in support, nine not supporting, and one abstention. The three members of the ASC did not vote, but even with their support Plaintiff would have failed by a wide margin. See Exhibit 60.

At the next step in the process, Professor Scott Burns, PT, DPT, Department Chair of the Temple Health and Rehabilitation Sciences, reviewed Plaintiff's Petition and the relevant documentation. He upheld Plaintiff's dismissal from the DPT program, advising her by letter dated September 2, 2020. Exhibit 39.

Plaintiff then pursued review by the College of Public Health Student Grievance Committee, setting forth her grounds in an email. Exhibit 62. In September, 2020, that five-member committee voted to support Plaintiff's dismissal from the program, setting forth the basis for its decision in writing:

> 1) The repeated and ongoing nature of the deficiencies in patient safety and clinical decision making. While the committee recognizes and sympathizes that current events around Covid-19 are adding stress to your situation, the difficulties with clinical decision making and patient safety have extended back to at least July 26, 2019.
>
> 2) The opportunities for remedial work to correct the situation. Numerous opportunities were provided for mentorship, remedial work, and reflection to assist you in recognizing and addressing patient safety issues and clinical decision making. During your own reflections (11/29/2019, 3/5/2020) you state that you understand the importance of room and hospital set up, but unfortunately this did not carry over to patient safety in the clinical setting. The committee felt this was at least due in part to a lack of deeper self-awareness and reflection.
>
> 3) The nature of the critical incidences which occurred. Without the direct and timely intervention of your clinical instructor on more than one occasion, a patient could have been injured, perhaps seriously. Patient safety has been a recurring issue throughout your remedial work.
>
> 4) Lack of patient empathy and consideration, while not demonstrated as an ongoing issue, [sic]

Exhibit 40.

Finally, Plaintiff pursued review by the Graduate Board Student Appeals Committee. Plaintiff engaged in an interactive process with Dr. Shawn Schurr, Associate Vice Provost for the Temple Graduate School, before her hearing, for which she submitted various additional materials.

At the hearing, held virtually, she had the opportunity to make a presentation and answer questions. The Committee rejected her appeal. Temple's Vice Provost advised Plaintiff in a letter that

> [t]he Committee found no evidence of procedural defects within the department. Prior remediation efforts were implemented, so that the program anticipated your success in the Clinical Experience. They carefully considered the circumstances of the pandemic and the difficulty that presented. Ultimately, it was the concerns for patient safety and self-reflection that resulted in their decision.

Exhibit 45.

I conclude that Temple followed a full and fair review process and afforded Plaintiff multiple opportunities to dispute her dismissal.

## II. Conclusions of Law

### a. Plaintiff has not proven the elements of a claim for promissory estoppel.

Under Pennsylvania law,

> to maintain an action in promissory estoppel, the aggrieved party must show that 1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; 2) the promisee actually took action or refrained from taking action in reliance on the promise; and 3) injustice can be avoided only by enforcing the promise.

*Crouse v. Cyclops Indus.*, 745 A.2d 606, 610 (Pa. 2000). When asked at trial, Plaintiff's counsel could not identify any specific promise made to his client on which she relied. He alluded to "implied" promises surrounding the educational program in which she was enrolled, but appeared in fact to be advancing some form of equitable argument based upon various elements of Plaintiff's personal situation, the challenges of the pandemic, and his criticisms of the way in which Temple conducted the program. That does not suffice to establish a claim under Pennsylvania law, because in educational setting Pennsylvania appellate courts require specific contractual language in the handbooks and policies of the university. *See Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. 1999), *alloc. denied*, 747 A.2d 902 (Pa. 1999).

Turning back to the Complaint, Plaintiff pleaded that Rebecca Operacz would "evaluate Plaintiff at the Hospital," ¶ 13; but this is refuted by the Syllabus which stated that Plaintiff would be "supervised in an affiliating clinical facility by a licensed physical therapist," Exhibit 14, *and* there was no testimony to the contrary at trial. And the record at trial reflected that Professor Operacz evaluated Plaintiff on an ongoing basis throughout her time as a student in the program and directly conferred with Plaintiff's Clinical Instructor while Plaintiff was at TUH.

Plaintiff suggests that she was promised a chance to complete her clinical placement before she could be dismissed, but this is squarely refuted by the DPT Clinical Education Handbook, which provides that a student could be "removed from the clinical environment due to safety or any other events or behavior deemed to be of significant concern by the clinical site." Exhibit 13.

Nor do challenges raised by the COVID pandemic give rise to any estoppel. In the first instance, Plaintiff identifies no promise that was made. The evidence shows that Plaintiff was given the opportunity to train remotely—an option that was accepted by a small number of students—but refused a virtual experience. And to the extent that personal protective equipment added some challenge, that challenge is inherent in the work of a physical therapist, who must wear protection in certain contexts—such as working with immunocompromised patients—regardless of the pandemic.

In summary, Plaintiff has failed to identify any specific promise on which she reasonably relied. Promissory estoppel does not provide a general equitable theory of recovery, and in any case the record at trial did not establish that Plaintiff's dismissal was an inequitable result.

### b. Plaintiff has not proven a violation of procedural due process.

Two cases from the Supreme Court define the scope of due process in an academic setting: *Board of Curators of the University of Mo. v. Horowitz*, 435 U.S. 78, 82-91 (1978), and *Regents*

9

*of the University of Michigan v. Ewing*, 474 U.S. 214 (1985).  Interpreting these cases, the Third Circuit has held that in academic dismissal cases:

> A formal hearing is not necessary; rather an "informal-give-and-take" between the student and the administrative body dismissing her is adequate.  "[A] hearing may be useless or harmful in finding out the truth as to scholarship."  *Id.*  Thus, in the procedural due process context, informal review and evaluation sessions between student and faculty meet constitutional requirements.

*Mauriello v. Univ. of Medicine and Dentistry of New Jersey*, 781 F. 2d 46, 50 (3d Cir. 1986) (citing *Horowitz*, 435 U.S. at 90).  In *Hankins v. Temple University (Health Sciences Center)*, the Court of Appeals reaffirmed its holding in *Mauriello*, stating: "[w]e read *Horowitz* and *Ewing* as requiring only that when a student is discharged for academic reasons, an informal faculty evaluation is all that is required."  829 F. 2d 437, 444-45 (3d Cir. 1987).

Here, Temple went far beyond what the law requires, and numerous members of the DPT faculty who had direct experience with Plaintiff were involved in the decision to uphold her dismissal.  In that regard, the Circuit has cautioned "that courts are generally ill-equipped to review subjective academic appraisals of educational institutions," and must "permit university faculties a wide range of discretion in making judgments as to the academic performance of students."  *Hankins,* 829 F. 2d at 444.

Plaintiff argues that she was denied due process because her dismissal followed immediately upon her failing the Clinic placement.  But the Clinical Handbook clearly authorized removal from the site based upon safety concerns, and the general Student Handbook made dismissal automatic if a student failed their clinical placement.  Her initial dismissal took place strictly in accordance with the rules of the program in which she had enrolled, and a robust appeal process then became available, which she pursued in full.

The suggestion that Temple was not entitled to rely upon the observations and judgment of skilled professionals such as Patricia Garcia Andrea Blau is completely lacking in merit. The evidence established their credentials and how Temple University partnered with them. Nor is there merit to the argument that until a patient suffers injury, a student is entitled to continue in the program. When the potential for injury is real, as reflected by the need for supervisors to intervene repeatedly, a graduate program in healthcare acts well within its authority in dismissing a student. And the suggestion that Temple should allow students to graduate and wait to see if they pass their licensing exam is hardly in the public interest. To the contrary, Temple is to be commended for its insistence on high standards and willingness to enforce them.

### III. Conclusion

It is clear that Plaintiff had a strong desire to pursue a career in physical therapy and that she sacrificed personally and financially in trying to accomplish that goal. It is also clear that family obligations and the pandemic increased her challenges. But as with many fields, aspirations are not always fulfilled. Physical therapy is a particularly demanding discipline. Its practitioners require deep knowledge of anatomy, medicine, and biomechanics, together with physical strength and the ability to relate to patients. Plaintiff need feel no shame in failing to meet her goal. But her personal disappointment does not sustain a cause of action.

    /s/ Gerald Austin McHugh
United States District Judge